816 F.2d 683
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Tommy Delbert STEVENS, Defendant-Appellant.
 No. 86-5608.
 United States Court of Appeals, Sixth Circuit.
 April 13, 1987.
 
 Before ENGEL, KRUPANSKY and GUY, Circuit Judges.
 PER CURIAM.
 
 
 1
 Defendant, Tommy Delbert Stevens, appeals his conviction for violation of 18 U.S.C. app. Sec. 1202(a)(1) which makes it unlawful for any person who has been convicted of a felony to receive or possess a firearm which has been shipped or transported through interstate commerce. After defendant's conviction, the government sought to proceed against defendant as a dangerous special offender pursuant to 18 U.S.C. Sec. 3575. A sentencing hearing was held and the trial court found defendant to be a dangerous special offender within the meaning of the statute and sentenced him to ten years' imprisonment. Defendant now appeals the judgment and commitment order. We affirm.
 
 
 2
 After arresting defendant on a traffic charge, the arresting officer, Kentucky State Police Officer David Dick, discovered a Winchester 30-30 lever action rifle in "wide open" view on the floor in the front seat of defendant's vehicle. It is this weapon which formed the basis for defendant's conviction. Before trial, defendant unsuccessfully sought to suppress introduction of the rifle into evidence. First, defendant argued that his arrest was unlawful and, therefore, the rifle should be suppressed. Second, defendant contended that even if he was lawfully arrested, the seizure of the rifle was the product of an illegal search and, consequently, it must be suppressed.
 
 
 3
 The trial court ruled that defendant's arrest was lawful. Moreover, the court found the seizure of the rifle was proper in that Officer Dick discovered the weapon, which was in plain view, while he was securing defendant's truck. In addition, the court held that the seizure could be justified as a search incident to arrest. On appeal, defendant challenges these determinations, as well as his conviction and sentence.
 
 
 4
 At the suppression hearing, Officer Dick testified as to the circumstances of defendant's arrest. He stated that on the afternoon of May 5, 1985, he received a call from headquarters that Stevens was reportedly driving a vehicle in the Tateville, Kentucky, area while under the influence of alcohol and in a reckless manner. Officer Dick also stated that defendant had a reputation as a dangerous person who had had several run-ins with the police, including a conviction for shooting a weapon at a police officer.
 
 
 5
 The officer testified that he drove to the street where defendant lived, which was where he had been spotted. The road is a narrow gravel dead-end road which, in certain places, cannot accommodate two cars. Officer Dick drove past defendant's house to the end of the road, turned around, and started back out. At that point, Officer Dick spotted the vehicle that defendant was reportedly driving coming toward him. The cars met at a point in the road where two vehicles could not pass. Defendant pulled his truck up bumper to bumper with the police cruiser. Officer Dick testified that he turned on the cruiser's lights and started to exit his car with the intention of asking defendant to step out of the vehicle, but just as he opened the door, defendant started backing up slowly. Officer Dick returned to his cruiser and followed defendant. Defendant stopped his truck one other time, and again, Officer Dick started to get out of the police car. Once again, defendant resumed backing up and this time backed all the way up to his driveway, and into the driveway just off the edge of the road.
 
 
 6
 Officer Dick stopped his car in the road in front of defendant's truck. He then opened the door of the police car and stepped out, yelling for defendant to get out of the truck. Defendant's truck window was open on the driver's side. The officer testified that defendant looked at him and then leaned over the seat out of sight. Although Officer Dick could still see defendant's left hand on the steering wheel, he could not see his body. The officer again yelled at defendant, who rose up and looked at the officer, but did not obey his commands. At that time, Officer Dick put his revolver back into his holster and knelt down to unzip the shotgun pouch attached to the front seat of the cruiser. He then testified:
 
 
 7
 When I was bent down unzipping the pouch, I heard what I thought was the, a snap or a--it sounded like metal against metal. And it didn't take me maybe fifteen seconds to get my shotgun out. And as I got my shotgun out of the pouch, I raised up, and as [I] stood up I jacked a round in the chamber. And as I was doing this, Mr. Stevens was standing out on the ground between his door and the body of the truck, and he was in the motion of turning his back to me pitching something back in the truck.
 
 
 8
 At this point, Officer Dick ordered defendant to step away from the truck. He then ordered defendant to walk to the front of the police cruiser, and defendant did so. Defendant was then arrested and handcuffed.
 
 
 9
 Officer Dick testified that after placing defendant in the cruiser, he walked over to the truck to shut the door, which defendant had left open. As he walked up to the truck, he saw the rifle in "wide open view" on the floorboard of the truck. Officer Dick picked up the rifle and ejected the cartridge. He then seized the rifle, rolled up the truck window, closed the door, and left. Defendant was charged with driving under the influence of intoxicants, driving on a suspended or revoked operator's permit, and carrying a concealed weapon.
 
 
 10
 On cross-examination, Officer Dick stated that defendant's intoxication was obvious when he finally emerged from the truck. He also stated that when he first tried to stop defendant, he turned on the blue lights on the cruiser and that they were on the whole time. Officer Dick testified that the "click" he heard led him to believe that defendant was trying to get a weapon and the noise was the barrel of the weapon hitting the truck.
 
 
 11
 Defendant first complains that there was no probable cause for his arrest. He argues that the officer justified the arrest only after he had leveled his shotgun on defendant and made him approach, and then smelled alcohol on his breath. Yet, according to defendant, he was realistically under arrest the minute the officer trained his gun on him. Consequently, defendant's arrest, which occurred at the moment Officer Dick aimed his shotgun at defendant, could only be justified by evidence discovered after the arrest, i.e., the fact that the officer smelled alcohol on defendant when he got close enough and the discovery of the shotgun in the truck.
 
 
 12
 We must disagree with defendant's careful characterization of the facts. In viewing the facts in the light most favorable to the government, United States v. Gibson, 675 F.2d 825, 829 (6th Cir.), cert. denied, 459 U.S. 972 (1982), Officer Dick received notification from headquarters that defendant, a person he knew to be dangerous, was driving drunk and recklessly on the street outside his home. When arriving at the street, the officer drove past defendant's house, toward a dead-end, and turned around. On his way back, Officer Dick spotted defendant in a grey truck. Defendant, driving past his own house, stopped his car directly in front of the police cruiser, "bumper to bumper." The officer testified that he thought it was odd that defendant would approach the cruiser and stop as he did. At that point, the officer was attempting to stop defendant to investigate a reported traffic violation. In spite of the fact that the cruiser's lights were going, defendant did not stop his truck, and instead, began backing up. Once again, defendant stopped the truck, and again, Officer Dick tried to approach the truck. Defendant resumed backing up until he reached the driveway. Concerned for his safety in light of defendant's rather erratic behavior and past reputation, in addition to the report of drunkenness, Officer Dick ordered defendant out of the truck. While ordering him for a third time to step out of the truck, Officer Dick reached for his shotgun. The officer also testified that the minute defendant left his truck he could tell that defendant was intoxicated by his unsteady walk, his manner, and his slurred speech.
 
 
 13
 Even if we were to hold that the informant's tip that defendant appeared to be driving while intoxicated was insufficient to justify an investigative stop, cf., Cook v. Kentucky, 649 S.W.2d 198 (Ky.1983), defendant's behavior once Officer Dick arrived on the scene was such as to lead an officer of reasonable caution to believe that an investigation was appropriate, i.e., defendant driving his vehicle so as to confront the police cruiser and block the road, Cook, 649 S.W.2d at 200 (relying on Terry v. Ohio, 392 U.S. 1 (1969)). Because defendant failed to pull over and stop when signalled by the officer, the police officer was free to demand that defendant alight from the truck once he reached the driveway. When defendant failed to follow those orders and, in fact, appeared to be reaching for something, Officer Dick, fearing for his safety, felt it necessary to retrieve his shotgun. This was a reasonable response under the circumstances and did not constitute an arrest without probable cause. Defendant was lawfully arrested immediately thereafter, however, when it was obvious that he was intoxicated. We see no constitutional infirmity in the arrest based on these events. Defendant has pointed to no authority which would support his contrary claims. Accordingly, the trial court correctly held that the evidence was seized after a lawful arrest.
 
 
 14
 Defendant next contends that the "search" of the truck was illegal and cannot be justified by any of the exceptions to the search warrant requirement. The trial court held that no search occurred in that the police officer had a right to be where he was and he discovered the weapon in plain view while securing defendant's truck. Furthermore, even if it was considered to be a search incident to an arrest, the court held that it was justified.
 
 
 15
 In our view, there was no search of the truck. Officer Dick testified consistently that he approached the truck in order to "secure" it; that is, to roll up the window and shut the door, which defendant had left open. He testified that such actions were in accordance with standard department procedures. When he approached the truck, Officer Dick saw the weapon on the floorboard in plain view. Accordingly, the seizure of the weapon was completely justified.
 
 
 16
 Defendant argues that the doctrine of "plain view" cannot save the alleged search in this case because the officer was trespassing when he came onto defendant's property and discovered the weapon. Defendant asserts that the police officer must be where he has a right to be in order for the plain view doctrine to apply. And, according to defendant, the officer had no right to be in his driveway.
 
 
 17
 We must disagree. The reason defendant's truck was located in his driveway was because he failed to stop when ordered to do so by the officer while still in the roadway. We can hardly see how failure to obey a lawful order from a police officer entitles one to greater constitutional protection than that received by persons who comply with police orders to stop while still in a public place.
 
 
 18
 Finally, we also agree with the trial court that were this to be characterized as a search, it was lawful as a search conducted pursuant to a valid contemporaneous arrest under New York v. Belton, 453 U.S. 454 (1980). While defendant again submits that this exception does not apply because the search did not take place on public property, we would again note that the police officer followed defendant onto his property after attempting to stop him in the roadway. Consequently, this is not an impediment to the search. Moreover, as defendant's truck, although in his driveway, was next to the road, it would have been particularly unwise for Officer Dick to leave it unattended, with the door open, if he suspected that there was a weapon inside.
 
 
 19
 Defendant next argues that the trial court erred in denying his motion for acquittal in that the government failed to prove beyond a reasonable doubt (1) that the rifle's component parts had not been assembled in the Commonwealth of Kentucky; (2) that there was a sufficient nexus with interstate commerce; and (3) that defendant was in actual possession of the rifle or that he even knew it was in the truck.
 
 
 20
 Charles Lanham, an expert witness for the government, testified that in his opinion the rifle was made in New Haven, Connecticut, and that this type of rifle had never been manufactured in the Commonwealth of Kentucky. Lanham did admit that it was theoretically possible for someone to have assembled the component parts in Kentucky, but his opinion was to the contrary because the proof mark on the barrel and the proof mark on the receiver indicated that the rifle was a "shooting firearm" while still in Connecticut. Based on this testimony, and viewing the evidence in the light most favorable to the government, United States v. Tilton, 714 F.2d 642, 645 (6th Cir.1983), the fact-finder could legitimately conclude that the rifle was not assembled in the State of Kentucky.
 
 
 21
 Defendant's second claim, that the government failed to prove an interstate nexus, may also be easily disposed of. Defendant's argument in this regard is that the gun apparently ceased to be in interstate commerce at least ten years prior to the date of the arrest. However, whether that is the case or not is immaterial. As stated by the court in United States v. Day, 476 F.2d 562 (6th Cir.1973):
 
 
 22
 "[T]he Government meets its burden here if it demonstrates that the firearm received has previously traveled in interstate commerce." 404 U.S. at 350, 92 S.Ct. at 524. If there is competent evidence to show that the guns possessed and received by the defendant were manufactured in a state outside of Kentucky, the state of possession in the present case, the conclusion is inescapable and the inference is permissible that the gun has traveled in interstate commerce before reaching the defendant. It should be noted that there is no requirement that the interstate commerce be shown to have been directly to [defendant]. United States v. Brown, 472 F.2d 1181 (6th Cir.1973). In this case, there was competent evidence before the jury to indicate that the guns found in appellant's possession were manufactured in Hartford, Connecticut, and Springfield, Massachusetts. Thus, the interstate nexus requirement of Bass was satisfied.
 
 
 23
 476 F.2d at 569. Likewise, since there was evidence that the rifle here was manufactured in New Haven, Connecticut, the interstate nexus requirement was satisfied.
 
 
 24
 As to defendant's third contention, that he was not in possession of the rifle and did not know the weapon was in the truck, in view of the fact that Officer Dick testified he found the weapon in plain view on the floorboard of the truck, the jury was free to conclude that defendant was in actual or constructive possession of the weapon. United States v. Beverly, 750 F.2d 34, 37 (6th Cir.1984) (actual possession exists when a tangible object is in the immediate possession or control of the party; constructive possession exists when a person does not have actual possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over an object). Similarly, the jury was free to conclude that defendant knew of the weapon's presence. Accordingly, the trial court did not err in denying defendant's motion for acquittal.
 
 
 25
 Before trial, the government timely filed a notice that if defendant were convicted on the charge, it intended to seek an enhanced sentence against him as a dangerous special offender, as authorized by 18 U.S.C. Sec. 3575. This statute defines a "special offender" as one who either: (1) has been convicted of two or more previous felonies, one within the last five years; (2) is a professional criminal in that he derives a substantial amount of income from criminal activity, and he manifests special skill or expertise; or (3) is an organized criminal in that the crime involved is a conspiracy in which the defendant played a supervisory role. To find a defendant a "dangerous" special offender, the court must conclude that "a period of confinement longer than that provided for such felony is required for the protection of the public from further criminal conduct by the defendant." 18 U.S.C. Sec. 3537(f). Once a court determines that a defendant is a dangerous special offender, it may sentence him "to imprisonment for an appropriate term not to exceed twenty-five years and not disproportionate in severity to the maximum term otherwise authorized by law for such felony." Id. at Sec. 3537(b).
 
 
 26
 While ordinarily appellate courts play a limited role in reviewing criminal sentences, 18 U.S.C. Sec. 3576 vests in them considerably more discretion to review a sentence imposed under the dangerous special offender statute. Section 3576 provides that after imposition of a sentence under Sec. 3575, either the government or the defendant may appeal to the court of appeals:
 
 
 27
 Review of the sentence shall include review of whether the procedure employed was lawful, the findings made were clearly erroneous, or the sentencing court's discretion was abused. The court of appeals on review of the sentence may, after considering the record, including the entire presentence report, information submitted during the trial ... and the sentencing hearing, and the findings and reasons of the sentencing court, affirm the sentence, impose or direct the imposition of any sentence which the sentencing court could originally have imposed, or remand for further sentencing proceedings and imposition of sentence, except that a sentence may be made more severe only on review of the sentence taken by the United States and after hearing.
 
 
 28
 18 U.S.C. Sec. 3576.
 
 
 29
 Defendant first complains that the trial court's finding of dangerousness was based upon "rumor and innuendo" about defendant's propensity for violence. We disagree. We find nothing in the trial court's lengthy findings to suggest that it relied upon, as defendant characterizes it, "courthouse gossip." While admittedly, during the sentencing hearing some witnesses, particularly law enforcement officers, testified as to defendant's reputation for violent behavior in the community, much of which was elicited by defense counsel, we see no indication that it impermissibly influenced the trial court's findings. Moreover, we note that Sec. 3577 gives courts broad authority to consider various types of information: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. Sec. 3577.
 
 
 30
 Next defendant complains that the sentence imposed, ten years, is excessive in relation to the underlying offense, for which the maximum sentence is two years. This sentence, according to defendant, resulted from an abuse of discretion by the trial court and violates defendant's right to be free from cruel and unusual punishment under the eighth amendment. Essentially, both these arguments constitute a claim that defendant's sentence is "disproportionate in severity to the maximum term otherwise authorized by law for such felony" contrary to Sec. 3575(b).
 
 
 31
 The proportionality language of Sec. 3575 does not give explicit directions to the judge on how to impose a sentence. The purpose of the proportionality language is to ensure that "the sentence for an offense remain[s] at least partially focused on [the underlying offense] rather than on prior conduct or other factors." United States v. Felder, 744 F.2d 18, 20 (3d Cir.1984). In Felder, the Third Circuit suggested guidelines for sentencing judges to effectuate that purpose:
 
 
 32
 In order to give effect to the proportionality requirement, the court imposing a sentence under the dangerous special offender provision must keep sight of the fact that the maximum sentence for the underlying felony is the only legitimate base for a proportional section 3757 sentence. In that way the underlying felony, which is the reason that the defendant is in court in the first place, will retain its central place in sentencing. The extent to which a sentence should be augmented will depend on a number of factors, such as the nature and seriousness of the conduct which led to the defendant's characterization as a dangerous special offender in the first place. Thus, for defendants characterized as dangerous special offenders because of recidivism ... the number, type and time of the prior offenses will be relevant, as well as "information about the defendant, his crime, and the context in which it was committed."
 
 
 33
 706 F.2d at 140 (quoting S.Rep. No. 617, 91st Cong., 1st Sess. 91 (1969)).
 
 
 34
 The court below engaged in a lengthy and careful analysis of the evidence presented during the hearing. The court first found that defendant was a special offender in that he was over the age of twenty-one and that he had been previously convicted in the state and federal courts for two or more offenses committed on occasions different from one another and from the instant felony, and punishable by imprisonment in excess of one year. The court also found that defendant had been imprisoned for more than one such conviction prior to the commission of the instant felony, and less than five years had elapsed between the commission of the instant felony and his release on parole from imprisonment for one of defendant's prior convictions. The court then listed defendant's felony convictions, which include: (a) a 1962 offense for possession of liquor for which defendant served from June, 1962, until September, 1967; (b) a 1964 conviction for transportation of forged securities in interstate commerce, served concurrently with the prior offense; (c) a 1969 conviction for malicious shooting at a sheriff for which defendant served until July, 1972; (d) a 1972 conviction for possession of firearms for which defendant was incarcerated until September, 1976; (e) a 1977 conviction for possession of firearms for which defendant was incarcerated until May, 1981; and (f) a 1981 conviction for wanton endangerment in the first degree involving a state police officer for which defendant was incarcerated until December, 1984. After the 1977 firearms conviction, defendant was adjudged a dangerous special offender. In addition to these felony convictions, the defendant was convicted once again for a violation of 18 U.S.C. app. Sec. 1202(a)(1) for the possession of a firearm by a convicted felon. This offense occurred on May 5, 1985, less than six months after he was last released from a penal institution for a felony conviction. Finally, the court noted that the instant offense again involved defendant being arrested for possession of a high-powered rifle and that the arresting officer had to use a shotgun to order defendant out of the truck.
 
 
 35
 The court also looked at defendant's numerous arrests and misdemeanor convictions, many for traffic violations and/or offenses involving alcohol. For instance, in 1963, defendant had five convictions for public drunkenness or operating a vehicle without an operator's license. Moreover, after defendant was released from the federal penitentiary for the offense listed in (d) above, on his release date he was arrested for public drunkenness and paid a fine. On the following day, he was rearrested and paid another fine. He failed to report to his parole officer for supervision upon his release and the parole officer made application for a warrant with the U.S. Parole Commission. The Commission declined a warrant because the defendant only had about one month before the expiration of his sentence. In addition, between the period of September 4, 1976, when he was released from the institution and August 27, 1977, defendant had fifteen other arrests which were alcohol or traffic related, eight of which were dismissed but seven of which resulted in conviction.
 
 
 36
 The court also found it significant that while defendant was on an appeal bond from his conviction as a dangerous special offender, he committed the offense listed as (f) above when he drove his pickup truck through a road check set up by Kentucky State Trooper Glenn Dalton. After a long pursuit toward Tateville in Pulaski County, defendant stopped his truck and got out of the vehicle and pointed a shotgun toward Trooper Dalton. Neither defendant nor Dalton fired a shot, but defendant escaped through the woods and was later arrested.
 
 
 37
 The court also noted that defendant has been charged with numerous other firearms offenses, but that the charges were later dismissed. Defendant was acquitted for murder in 1969 in the Pulaski Circuit Court. Defendant testified below that his defense was self-defense in that case, but then he stated that someone else might have shot the victim. Finally, arising out of the same arrest as the instant case, defendant was convicted for driving under the influence of intoxicants and for driving without an operator's license and was fined for both of these.
 
 
 38
 In addition to the convictions listed, the other factors given by the court as warranting defendant's sentence were: (1) the defendant's propensity for pointing firearms at law enforcement officers; (2) the previous finding that the defendant was a dangerous special offender; (3) the commission of criminal offenses while on parole and on appeal bond; and (4) the diagnosis by the staff of the United States Medical Center for Federal Prisons at Springfield that the defendant has an anti-social personality disorder and a history of alcohol abuse.
 
 
 39
 Finally, it is significant that the court below was well aware of the proportionality requirement in relation to the underlying offense, as well as the maximum sentence for such offense. The court expressly determined that a period of confinement longer than that provided under the charge was required for the protection of the public from further criminal conduct by defendant and in order to serve the congressional purposes of the Act. Accordingly, the court sentenced defendant to ten years' imprisonment.
 
 
 40
 In this case, the district court fully articulated the reasons for its sentence and carefully followed the guidelines discussed above. We have reviewed the court's sentence and conclude that the district court clearly acted within its discretion in imposing the ten-year sentence. Moreover, we note that defendant's sentence is consistent with other sentences imposed on dangerous special offenders where the underlying conviction was also based on 18 U.S.C. app. Sec. 1202(a)(1). United States v. Cox, 719 F.2d 285 (8th Cir.1983), cert. denied, 466 U.S. 929 (1984) (six years); United States v. Davis, 710 F.2d 104 (3d Cir.), cert. denied, 464 U.S. 1001 (1983) (twelve years); United States v. Harris, 703 F.2d 508 (11th Cir.1983) (rev'd on other grounds) (ten years); United States v. Williamson, 567 F.2d 610 (4th Cir.1977) (eight years); United States v. Bowdach, 561 F.2d 1160 (5th Cir.1977) (five years).
 
 
 41
 The judgment of the court below is, accordingly, AFFIRMED.